UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| YESENIA RODRIGUEZ, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 16-30163-MGM |
| NANCY A. BERRYHILL,[1] | * | |
| Acting Commissioner of Social Security, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM AND ORDER REGARDING
PLAINTIFF'S AND DEFENDANT'S MOTIONS FOR JUDGMENT ON THE PLEADINGS
(Dkt. Nos. 12 and 20)

June 26, 2018

MASTROIANNI, U.S.D.J.

## I.    INTRODUCTION

This is an action for judicial review of a final decision by the acting Commissioner of the

Social Security Administration ("Commissioner") regarding an individual's entitlement to

Supplemental Security Income ("SSI") and Social Security Disability Insurance ("SSDI") under

Titles XVI and II, respectively, of the Social Security Act (the "Act"). *See* 42 U.S.C. §§ 405(g),

1383(c)(3). Yesenia Rodriguez ("Plaintiff") argues that the Commissioner's decision denying her SSI

and SSDI—memorialized in a April 14, 2015 decision of an administrative law judge ("ALJ")—

rested on legal error. Plaintiff has filed a motion to reverse that decision and the Commissioner has

moved to affirm. For the reasons and to the extent set forth below, the court DENIES the

Commissioner's motion (Dkt. No. 20) and GRANTS Plaintiff's motion (Dkt. No. 12).

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017, and is substituted automatically as the defendant pursuant to Federal Rule of Civil Procedure 25(d).

## II.   BACKGROUND AND PROCEDURAL HISTORY

Plaintiff applied for the SSI and SSDI on April 13, 2010, claiming disability with an onset date of May 1997.  (Administrative Record ("A.R.") at 269-82.) She was 33 years old when she initially applied; she is now 41 years old. (*Id.* at 133). She has a high school education and her relevant prior work experience involved approximately one year as a part-time ticket agent for an airline in or around 1996. (*Id.* at 20, 23, 56-57). The record also indicates that Plaintiff received workers' compensation benefits for several months after that employment ended due to injury to her back, neck, and shoulders.  (*Id.* at 58). At the time of her first administrative hearing she subsisted on government benefits. (*Id.*)

On December 1, 2010, the Social Security Administration ("SSA") advised Plaintiff that both her SSI and SSDI applications were denied. (*Id.* at 142-47). Plaintiff sought reconsideration on February 3, 2010, (*id.* 151-52), which was denied on August 4, 2011, (*id.* at 153-58). Roughly two months later Plaintiff sought a hearing before an ALJ. (*Id.* at 159). The hearing took place over a year later, on November 27, 2012. (*Id.* at 48-84, 184-99). At that hearing Plaintiff asserted disability due to both physical and mental impairments. Her claimed physical impairments included: asthma, back pain that spread to her shoulders and legs, ankle problems, arthritis, and headaches. (*Id.* at 58-80). Claimed mental impairments included depression with suicidal ideation, anxiety, and panic attacks. (*Id.*)

On January 18, 2013, the ALJ issued a decision finding Plaintiff was disabled as of April 13, 2010 due to major depressive disorder, generalized anxiety disorder, posttraumatic stress disorder, panic disorder, headaches, anemia, right ankle pain, chronic arthralgia and myalgia, obesity, asthma, chronic bilateral wrist/hand numbness and weakness, and chronic back pain. (*Id.* at 89-112). The ALJ also expressly found that Plaintiff was not disabled due to any impairments prior to that date and, because Plaintiff's date last insured preceded that date by over a year, denied the SSDI

application. As for Plaintiff's SSI application, the ALJ granted with an onset date of April 13, 2010. (*Id.* at 105).

Plaintiff then appealed that decision to the SSA Appeals Council in an effort have the SSDI denial reversed.[2] The Council granted review and issued a decision entirely unfavorable to Plaintiff, essentially forcing the ALJ to reverse the decision to grant SSI and affirming the SSDI denial *sub silencio.*[3] Specifically, the Council held the ALJ's finding that Plaintiff would be "off task for at least 25 percent of the workday due to secondary effects of chronic pain and psychiatric symptoms [was] not supported by substantial evidence." (*Id.* at 114). Citing particular items of evidence discussed below, the Council remanded and ordered to the ALJ to "further consider" Plaintiff's functional limitations. (*Id.* at 114-16). After a second hearing held on November 17, 2014, the ALJ issued her decision in accordance with the Council's directives on April 14, 2015, finding Plaintiff not disabled during all relevant timeframes and denying both her SSI and SSDI applications. (*Id.* at 14-47, 118-41). That denial resulted from a second Residual Functional Capacity ("RFC") assessment that did not include the limitation of being "off task" for 25 percent of each work day. Plaintiff again made an administrative appeal, which was denied, and ultimately sought judicial review in the instant case on September 27, 2016.

A.    **Medical and Documentary Evidence**

The record contains volumes of medical evidence concerning both physical and mental impairments. As they relate to mental health issues,[4] the earliest medical records derive from

---

[2] Plaintiff's counsel, Tricia Jacobs, stated at a second hearing before the ALJ "that the reason we did appeal was based on the [DIB] application, the date last insured." (*Id.* at 18)

[3] The Appeals Council's remand order stated it would take "separate action" on Plaintiff's DIB application, although its SSI analysis essentially required denial of the DIB application as explained below.

[4] Because the court finds that the ALJ erred by misconstruing the record of Plaintiff's mental impairments, and because the ALJ's final denial resulted from flawed directives concerning the same, the court only recounts evidence of mental impairments at length here.

Northgate Medical P.C., a Springfield healthcare provider now permanently shuttered. Northgate records establish that Plaintiff visited the facility and discussed her mental health no fewer than 25 times between March 2000 and December 2007. (*See id.* at 542-78; 605-28). Some Northgate records indicate mental health was a primary reason for a visit, while others indicate Plaintiff presented with primary complaints that were physical in nature. In any event, her depression and/or anxiety were documented at virtually every Northgate visit. A Northgate "Follow Up Form" dated March 3, 2000 indicates that Plaintiff first presented there when 22 years old and pregnant, complaining of loss of sphincter tone and sudden "falls to the floor." (*Id.* at 565). She presented again at a walk-in visit two weeks later complaining of coughing, fever, wheezing, and depression. (*Id.* at 610). Her depression is further mentioned in Northgate records stemming from scheduled appointments and walk-ins in April, September, and October of 2000; May of 2001, June of 2003, June of 2004, July and October of 2006, January, February, May, October, and December of 2009; and March and April of 2010. (542-78; 605-28). A "Follow Up Form" dated September 22, 2000, describes Plaintiff as suffering from depression and notes that her medication was "making her sick." (*Id.* at 563). A "progress note" on the same form further recounted that Plaintiff had twice been to a crisis unit for suicidal ideation and that she had "wild anxiety." (*Id.*) The same field suggests the reviewing doctor had intended to prescribe Wellbutrin as a replacement for Prozac but abruptly ends with a note that "patient left before the end of the visit." (*Id.*) A July 2006 record noted that Plaintiff was "back in town" living at a homeless shelter. (*Id.* at 554). Northgate forms from October 2006 state she visited the emergency room for chest pain, when she was "going through stressful times" and had stopped taking Celexa one month prior. (*Id.* at 551). A handwritten note on the same form states, without elaboration, "awaiting Valley Pysch[,]" a reference to the Valley Psychiatric Services ("VPS") mental health clinic in Springfield, MA. (*Id.*) Plaintiff presented again in December of 2009 complaining of hallucinations and suicidal thoughts. (*Id.* at 611). An October 2010 "Follow Up Form" recounts that

Plaintiff presented complaining of anxiety, depression, and numerous body pains. (*Id.* at 562). The same document notes "longstanding depression since 1996," visits to the crisis center, "high anxiety level," and recounts prescriptions for Paxil, Celebrex, and other medications. (*Id.* at 562).

Records from Mercy Medical Center ("MMC") disclose Plaintiff made frequent emergency room visits as early as 2002. Only those records relevant to the instant analysis are discussed here. An admission form from a May 17, 2002 visit to the MMC ER lists "STS Sexually Assaulted" as the primary complaint and "admitting diagnosis." (Id. at 444-48). In the "clinical impression" field the reviewing physician visit cryptically noted "Anxiety Reaction" without elaboration. (Id. at 446). An R.N.'s notes from an April 24, 2003 emergency room visit state that Plaintiff presented with complaints of lack of sleep, depression, and suicidal ideation. (*Id.* at 443). The R.N.'s notes recite that Plaintiff had stopped taking psychotropic medications four months prior, that Plaintiff "hadn't slept" for an unspecified amount of time, and that Plaintiff had not eaten for five days. (*Id.* at 443). The same R.N. recorded her recommendation that Plaintiff "see psychiatrist for counseling & meds & suicidal ideation." (*Id.*)

Plaintiff's earliest recorded visit to a mental health facility, rather than an emergency room or urgent care clinic, date to March 9, 2002, when she first presented at VPS and received a diagnosis of dysthymia.[5] (A.R. at 885). An "Initial Medication Evaluation" form completed for that visit by Matthew Friedman, M.D., indicates Plaintiff was 25 years old at the time and had received treatment and medication for her mental health on an "on again off again" basis since 1997. (*Id.*). It also noted a history of sexual abuse and suicidal behavior. (*Id.*) Freidman increased dosage of Paxil, a psychotropic drug used to treat anxiety disorders, and other prescribed medications in mostly

---

[5] Dysthymia is "[a] chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness[.]" Stedman's Med. Dictionary 556 (27th ed.2000).

illegible handwriting. (*Id.*). He scheduled a follow up visit for May 8, 2002, but no records appear to have been produced for/from that visit.

The next relevant record is a "Diagnostic Summary," also from VPS, dated June 6, 2003. (A.R. at 878-84). Therapist Joanne Tan, M.S.W., reported in the "objective impression" section that Plaintiff appeared "to have past and current trauma issues of abuse . . . . She was sexually abused by her father and mom's SO from age 5 [until] age 15 and currently . . . is struggling to forgive her mother." (*Id.* at 878). Tan also noted Plaintiff had two active restraining orders against her last boyfriend and had "multiple admissions to CSU" for suicidal ideation and anxiety. (*Id.*). Under "medical history," Tan noted that Plaintiff had been admitted for inpatient treatment to Bay State Medical Center for the last half of April 2003 and "for a week" between May and June at "CSU in Northampton." (*Id.* at 878, 880). Tan further recorded Plaintiff's complaints of auditory hallucinations, and noted Plaintiff's reports of a current and historical "suicidal ruminations w/ plans of throwing self on [a highway], although she reported not having the courage to do so [because] of her sons." (*Id.*). Past and present psychotropic medications included trazadone, Paxil, lorazepam, and "Prozac b/c of adverse side effects." (*Id.* at 880). The report concluded with diagnoses of severe major depressive disorder, post-traumatic stress disorder, and general anxiety disorder. (*Id.* at 883-84).

An "Initial Medication Evaluation/Session Note," dated August 28, 2003 and completed by David Adair, R.N., P.C., contains similar findings and diagnoses and recounts similar medication histories. This evaluation appears to result from Plaintiff's first visit with Adair at Tan's referral. Adair noted a high degree of anxiety, "a lot of flashbacks re: childhood father" and other childhood sexual abuse. (*Id.* at 877). He prescribed Celexa and Trazadone and noted a diagnosis of major depressive disorder with "severe psychotic features." (*Id.*)

A "Therapy Review" form dating from August 2003, bearing signatures from a social worker, psychologist, psychiatrist, and "utilization manager" summarizes at least 12 therapy sessions at VPS between May and August of 2003.[6] (*Id.* at 876). The form indicates Plaintiff received weekly treatment for "depression and fears." (*Id.*) The form recorded Plaintiff's statements that "coping skills learned in [therapy] ha[d] assisted [with] orientation and ability to maintain structure in [her] daily activities although both still remains [sic] a problem for her." (*Id.*) Reference is made to a plan to continue working through treatment to "resolve issues of grief" and assist with "maintenance of depression, working closely [with] DSS worker Sam Jones and follow-up on Rx regime." (*Id.*) The form also indicates Plaintiff had spent the weekend in a Northampton hospital in June for suicidal ideation. (*Id.*)

Another Therapy Review form dating from November 2003, also bearing signatures from a social worker, psychologist, psychiatrist, and "utilization manager" summarizes 10 more therapy sessions between August and November of 2003. (*Id.* at 875). The form indicates Plaintiff received treatment on a weekly basis, made some progress in coping with her depression and trauma, and received a "target date" of December 2005 for effective coping and therapy termination. (*Id.*)

The final Therapy Review form from this period, dated February 2004, bears similar signatures and summarizes at least seven weekly visits made between November 2003 and February 2004. (*Id.* at 874). It recounts Plaintiff's reports of "sig[nificant] decrease in depressive [symptoms] although does have recurrent episodes, especially during times of stress." (*Id.*) Plaintiff is described as "consistent" in treatment and working on "improving self-esteem through goal directed activities." (*Id.*) The treatment plan remained largely unchanged and focused on coping with

---

[6] The only legible signature belongs to Joanne Tan, M.S.W., who signed the form on November 5, 2003. The remaining signatures were added—presumably after further review—in later November and early December of the same year.

depression and "resolving past trauma." (*Id.*). The target termination date remained "December 2005." (*Id.*).

A session note dated May 20, 2004 describes Plaintiff's "frantic" and "distressed" state after learning her brother was killed while serving in Baghdad. (*Id.* at 873). The note also indicates Plaintiff experienced a "second" domestic violence incident by the father of her four- and five-year-old children and received an eviction notice the day prior. (*Id.*)

A "Discharge Summary" appears from VPS two weeks later, dated June 4, 2004. (*Id.* at 872). The reason for discharge is noted as "moved out of area," with the explanation that Plaintiff "decided to return to P[uerto] R[ico] abruptly." (*Id.*) The form's "Review of Treatment" field states Plaintiff was "fairly inconsistent" in treatment, but noted some progress in depression and "PTSD issues" despite "constant chaos in environment." (*Id.*) At the time of discharge Plaintiff displayed a high degree of anxiety and depression, and her "Final Functional Status" was described as involving difficulty fulfilling daily tasks, poor concentration, and "poor STM" due to "constant chaos in environment." (*Id.*)

Plaintiff presented at the MMC emergency room again on October 25, 2006, presumably after she returned from Puerto Rico, complaining of "sudden" and "sharp" chest pains and anxiety. (*Id.* at 355-56). A triage form describes her as "alert" and "anxious" and noted that she had stopped taking Celexa two weeks prior. (*Id.* t 356). She was prescribed Celexa and discharged on the same day. (*Id.* at 360). Diagnoses included "chest wall pa / situational stress." (*Id.* at 358). She presented again when 22-weeks pregnant on May 14, 2007, with a cough, diffuse wheezing, black stool, and a rash. (*Id.* at 475). MMC records dated May 14, 2007, indicate she was treated for pneumonia, bronchitis, and reactive airway disease. (*Id.* at 476). As of that date she was listed as "home" and "improved." (*Id.*) Plaintiff presented again at MMC on June 5, 2007, now 25 weeks pregnant, with complaints of a "loss of fetal movement." (*Id.* at 469). She was admitted the same day to address

"fetal demise" and discharged one day later. (*Id.* at 465-67).[7] Plaintiff checked into MMC again several months later, on November 7, 2007. (*Id.* at 453). The intake form lists "reason for visit" as "suicidal." (*Id.*) The physician attending at intake recorded Plaintiff's comments that she "didn't feel well," felt like she could not breathe, and "doesn't want to be around anymore" and diagnosed her with depression, suicidal ideation, and urinary tract infection. (*Id.* at 453-57).

Shortly after her miscarriage in June and before her November emergency room admission for suicidal ideation, Plaintiff resumed treatment at VPS. A second VPS intake "Diagnostic Summary" form dated August 16, 2007 records that Plaintiff was referred for treatment on July 17, 2007 and first reappeared for treatment on August 8, 2007. (*Id.* at 892-97). She is quoted as presenting with the complaint "I'm depressed [and] suffer from anxiety. I just lost a baby in June." (*Id.* at 892). Dawn Faniel-Hall, M.S.W., who completed the intake form, noted after that quote that Plaintiff "has life difficulties." (*Id.* at 892). Faniel-Hall described the "history of the presenting problem" as:

> two to three years of economic, family, housing hardship. Recent loss of child & trying to leave current boyfriend who has STD's & is using drugs.

*Id.* In the "therapist's observation" field, Faniel-Hall stated:

> Yessania [sic] is a bright girl who has made some bad decisions in her life. She wants to do better for herself [and] is goal-oriented.

*Id.* Elsewhere the report notes that Plaintiff had lost an unspecified job and apartment in the prior year and "ended up in a women's shelter." (*Id.* at 893). "That is when the children first went to their dad's apartment." (*Id.*) Current medications were listed as 10 milligrams of Celexa and an unspecified dosage of Ambien. (*Id.* at 894). Faniel-Hall's "case formulation" described Plaintiff as "articulate . . .

---

[7] A subsequent session note from VPS clarified that the fetus died on June 5, but Plaintiff had to carry until June 15, when labor was induced. (*See id.* at 890).

with an affect incongruent to mood." (*Id.* at 896). Her mood was "sad/depressed" but she appeared "cheerful and smile[d] often" without suicidal ideation. (*Id.*) Diagnoses included major depressive order ("single episode = post-partum onset"), "generalized anxiety," and a GAF score of 65-70.[8] Listed "medical conditions" also included "pre-cancerous cells on ovary." (*Id.* at 897).

An August 17, 2007 VPS "Initial Treatment Plan" form repeated those diagnoses and listed "treatment focuses" as "mood depressed, panic/anxiety, PTSD symptoms, [and] self-esteem." (*Id.* at 891). Planned treatment methods included individual therapy, group therapy, and medication. Criteria for termination of treatment and stated goals included "attendance" at individual therapy, coping skills, medication management, and "controlled mood." (*Id.* at 891). An "initial medication evaluation/session note" signed by Adair one month later states that Plaintiff had been "stable until stillbirth June 07 which collapsed plan of children coming [to live with her and caused her to develop] symptoms." (*Id.* at 890). He further noted Plaintiff was "afraid to go out, [thought] people will stare," "just stayed in bed," and stopped meeting her children in the park because they "pick up [her] vibe." (*Id.*) In all caps, Adair stated "NO CONTROL OF ANXIETY." (*Id.*) Mental status is described as "casual dress, well groomed. Anxious affect / mood. '7' on 1-10 (10 worst). Logical coherent & thoughtful." (*Id.*) Planned treatment included increasing Celexa dosage from 10 to 20 grams. (*Id.*)

A VPS session note dated October 29, 2007 records further disruption in Plaintiff's life.[9] The substance of the note provides:

---

[8] A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." Diagnostic and Statistical Manual of Mental Disorders, Fourth Ed., Text Revision, 32 (2000). A score between 71 and 80 denotes temporary, expectable reactions to stressors and no more than slight impairment. *Id.* at 34. A score between 61 and 70 denotes "mild" symptoms or limitations. *Id.* A score between 51 and 60 denotes "moderate" symptoms or limitations. *Id.* A score between 41 and 50 denotes "serious" symptoms or limitations. *Id.*

[9] The date of the visit is listed as October 29, 2007, whereas Adair's signature, presumably affixed upon review, is dated November 14, 2007.

> Client is understandably upset as the father of her children was arrested Friday for possession and distribution of drugs within a school zone. She said that he told her on Sunday after she dropped the children off that she should get legal help if she wants to see the children again. She is seeking legal consultation and wants to obtain full legal custody of them, as she certainly does not want her children around drugs. She has been quite anxious but notes that the Ativan Celexa are keeping her mood controllable and seemed very logical., coherent and seemed to be coping actually quite well given the circumstances. Ambien has not been helpful at 5mg for her insomnia given circumstances thus will increase to 10mg.
>
> Mental Status Examination: Well-dressed and well-groomed, presentation is appropriate, anxious, affect is congruent with circumstances. Future and goal oriented [sic], there is no indicators [sic] of thought disorder, suicidality etc. She is also dealing with severe anemia but continues to take a medicine for this.

(*Id.* at 889.) The form listed the next appointment date as December 10, 2007, although, as with most appointments at VPS, the visit did not generate particular records. (*Id.*)

A therapy review form completed by the social worker and dated November 13, 2007, summarized visits and progress occurring between August and early November 2007. (*Id.* at 888). It stated that Plaintiff had kept all appointments that quarter and "seem[ed] to comply [with a] DSS [treatment] plan" and announced in therapy her "plans to either parent her two boys or give up custody to their father." (*Id.*) Termination criteria is vaguely stated as "resolution of significant symptoms." (*Id.* at 888).

Chronologically, the next record from VPS is a discharge summary form dated March 25, 2008. Plaintiff's address is listed as "homeless," and "reason for discharge" is listed as "no shows." (*Id.* at 887). A treatment review field provides that Plaintiff was grieving the loss of a child "but also was experiencing problems parenting two boys [with] no resources of own." (*Id.*) "Final functional status" is listed as "unknown," and the "follow up recommendations" field states, in full, "to re-apply for services once she is stable [and] has an address." (*Id.*)

On October 25, 2008, Plaintiff presented at the MMC ER complaining again of chest pains. (Id. at 357). The intake form is largely illegible, but appears to record Plaintiff's statements that her chest pains were "sharper" than before and includes a description of Plaintiff as "fearful." (Id. at 357). She was also marked for "Depression SDHI." On April 30, 2009, Plaintiff presented at MMC with a "female genitourinary complaint." (Id. at 481). The "subjective data" field of the intake record state "pt is here because her boyfriend tested positive for an std and is currently on antibiotics." (Id.) The past medical history field notes "depression; anxiety," and the departure disposition states "left without treatment." (Id.) Plaintiff presented at MMC with similar complaints several times in 2008, often with reports of vaginal bleeding or discharge. (See, e.g., A.R. at 344, 505, 512). Her emotional state is frequently listed as "anxiety." (See, e.g., id. at 51).

Plaintiff briefly revisited VPS in March of 2010, just before she submitted the SSI and SSDI applications at issue here. She was referred by an unspecified source on March 8, 2010, and appeared for her first session on March 23, 2010. (Id. at 579, 585). A diagnostic summary from her intake described the history of her "presenting problem" in mostly non-forensic terms familiar from the above recital. It notes "a long history of multiple DV relationships [and] abuse in family" and further describes Plaintiff as in a "DV relationship" with a man she had recently married and that required "police involvement multiple times." (Id. at 579) That form further recounts that Plaintiff was due to be evicted and move into a one bedroom apartment with her husband, mother-in-law, and brother-in-law and "3 pitbulls." (Id.) The "therapist observation" field described Plaintiff as having a "flat affect" and a "tendency to avoid certain subjects even though she was the one who initiated conversation." (Id.) A psychosocial history section states that Plaintiff left for Puerto Rico for 8 months and that she had worked at the Eastfield Mall "doing surveys" between March and October of 2008. (Id. at 580). A mental examination resulted in marks for "alert to person, place, and time," "disoriented," behavior within normal limits, normal/fluent speech, appropriate and neat dress,

"sad/depressed," "flat/restricted" affect, loose associations and flight of ideas, observable

hopelessness, good eye contact, impaired concentration and recent memory, impaired judgment due

to or exhibited by her "remaining in DV household," absence of hallucinations, insomnia, and poor

appetite. (*Id.* at 583). Treatment targets were identified as increasing coping skills and esteem, leaving

her domestic relationship, and securing housing, employment, and/or financial assistance. (*Id.* at

584). Her mental health diagnosis included major depressive disorder (recurrent/moderate) and a

deferred diagnosis in the personality disorder axis. (*Id.* at 584). An April 28, 2010 "initial treatment

plan" form repeats those findings and diagnoses and lists as "measurable goals" a decrease in

"teariness" and better sleeping habits and coping skills. (*Id.* at 585). The same form lists "criteria for

termination" as involving a return to "pre-level of effective fx & able to cope w/ stressors &

conflicts for a period of 6 months." (*Id.*) A "preliminary plan" geared towards that end involved

leaving a "DV relationship" and obtaining her own housing. (*Id.*)

The next and final record from VPS is an August 18, 2010 discharge summary. The

discharge date is listed as August 6, and the "review of treatment" field states, without elaboration,

that "throughout [treatment Plaintiff] struggled w/ multiple moves / homelessness & abusive

relationship. [Zero] progress towards goals." (*Id.* at 827). The reasons for discharge is again listed as

"exceeded No-Show limit." (*Id.*)

In January of 2011 Plaintiff again visited the MMC ER. The "reason for visit" is listed as

"domestic disturbance at home." (*Id.* at 631.) Under "chief complaint / subjective data" the intake

form states: "she was fighting with her husband. Police were called and PT decided to come here.

PT denies any suicidal ideation." (*Id.*) A summary report recounts that she presented saying she did

not "feel safe at home" and "complain[ed] of increased anxiety." (*Id.* at 635). Plaintiff is otherwise

described as cooperative, oriented, and nourished. (*Id.* at 632). Additional comments note she felt

"better" and "more relaxed since receiving Ativan" and diagnosed her with "acute anxiety attack." (*Id.* at 633).

On June 2, 2011, Plaintiff received a mental consultative examination in response to the instant SSI and SSDI applications. Peter Bishop, Ph.D., performed the examination on behalf of the Massachusetts Rehabilitation Commission Disability Determination Services ("DDS"). (*Id.* at 664-69). Bishop's report recounts that Plaintiff lived alone in a motel room and was the mother of two children, who lived with their father. (*Id.* at 664). Plaintiff's presented to him as follows:

> The examinee states that she has depression, anxiety, and nightmares. She states that she feels very overwhelmed with everything in her life. She states that she feels like crying all the time. She states that she feels just broken. The examinee cries as she describes these issues.

*Id.* at 664. She also noted experiencing numerous stillbirths and her history of trauma recounted above. (*Id.* at 665). She reported experiencing depression since a child and that she had been hospitalized for psychiatric issues for the first time in 1997 and again in 2002 and 2003. (*Id.* at 665). In the "Mental Status Examination" section of his report, Bishop noted her eye contact as "good" and found her oriented to person, place, and time. (*Id.* at 664). Her intellectual functioning was estimated "in the average range," but memory of recent events was "somewhat impaired." (*Id.*) Long term memory was listed as "basically intact," but thought processes were "often confused by intrusive memories." (*Id.* at 664-65). Thought content was "marked by hallucinatory perceptions, paranoia, suspiciousness, preoccupation, negativity, and self-denigration." "She describe[d] hallucinatory experiences as hearing noises, which include hearing someone knocking[,]" but denied use of alcohol or drugs. (*Id.* at 665-66). She reported her only social interactions as involving visits from her children and the maid who cleaned her hotel room. (*Id.* at 666). She cried throughout the examination, mostly when reporting traumatic experiences or panic attacks. (*Id.* at 665-668). "She expressed with frustration the experience of waking up from a nightmare, going back to sleep, and having the same fearful dream." (*Id.* at 668). On the whole, Bishop found her account "focused and

truthful" and "evoking experience haunted by intolerable memories and fear." (*Id.* at 668). In summarizing his review, Bishop stated:

> The examinee reported a history of repeated traumatic abuse, loss anxiety, and depression, which began in childhood. She endorsed the following symptoms: preoccupation, flashbacks, nightmares, hypervigilance, depressed mood, diminished interests, negative self cognitions, generally negative thinking, reduced concentration, psychomotor retardation, insomnia, panic, social avoidance, fear of attack, and behavioral compulsions. The examinee's reporting appeared to be genuine. Her fear of leaving her living space and fear of being in the approximaty [sic] of others would make it very difficult to be in the proximity of the workspace. Her sensitive fear would lead to withdrawal from work [and] lead to withdrawal and nonattendance. Panic would add to her resistance to leave her home. The claimant's symptoms are consistent with diagnosis of chronic depressive disorder, recurrent severe without agoraphobia.

(*Id.* at 668). At the end of his report, he recorded "diagnostic impressions" of posttraumatic stress disorder, major depressive disorder (recurrent severe), panic disorder "without agoraphobia," and described her in terms along "Axis IV" of his analysis as "[n]early housebound" with "[v]ery narrow social support." (*Id.* at 669). He assigned a GAF score of 50.

On June 9, 2011, Lawrence Langer, Ph. D., reviewed the record as it had been compiled at that point and opined on Plaintiff's impairments and limitations—without personally examining or meeting with Plaintiff—in two prefabricated forms: a SSA-2506-BK Psychiatric Review Technique Form (commonly known as a "PRTF") and a SSA-4734-F4-SUP Mental Residual Capacity Assessment Form ("MRFC Form"). (*Id.* at 685-702). On the prefabricated MRFC Form, in which the evaluator checks boxes indicating levels of limitations for various capacities and abilities, Langer indicated Plaintiff had either minor or moderate limitations in the fields of "understanding and memory," "sustained concentration and persistence," "social interaction," and "adaptation." (*Id.* at 671-72). In full, his concluding notes state:

> A. Adequate memory and understanding for simple 1-2 step, detailed and some complex tasks.

> B. Adequate sustained concentration, persistence, and pace for at least simple 1-2 step tasks.
> C. Able to accept limited coworker interaction.
> D. Adequate adaptation to infrequent and planned change in most work-like settings.

(*Id.* at 673.) On the prefabricated PRTF form, Langer indicated the evidence "insufficient" to make complete medical dispositions but nevertheless opined that Plaintiff suffered from affective and anxiety-related disorders. (*Id.* at 675). Under "Affective Disorders," he checked boxes for "depressive syndrome" as characterized by "decreased energy," "feelings of guilt or worthlessness," and "difficulty concentrating or thinking." (*Id.* at 678). He left "thoughts of suicide," "sleep disturbance" and "hallucinations, delusions or paranoid thinking" unchecked. (*Id.*) Under "Anxiety-Related Disorders" he checked answers indicating "[a]nxiety as a predominant disturbance," "[r]ecurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week," and "[r]ecurrent and intrusive recollections of a traumatic experience, which are a source of marked distress." (*Id.* at 680). The form also included marks indicating "mild" and "moderate" limitations in various other functional categories.

On March 29, 2012, Plaintiff again visited the Mercy Medical Center emergency room with abdominal pain and vaginal discharge. (*Id.* at 768-71). On a computer-generated "ED Summary Report" generated during that visit, "Standard Screening Items" indicate the following questions were asked:

> Are you currently feeling symptoms of Depression?
> Have you ever had feelings of self harm in the past?
> Are you currently having feelings of self harm?

*Id.* at 769. "N" is listed to the right of each question, indicating a negative answer. (*Id.*) Behavior was described as "appropriate" and "cooperative." *Id.* at 770. Under the heading "Safety Precautions,"

"psychosocial distress" was described as "not applicable." (*Id.* at 770). Plaintiff was given a prescription for Percocet, had cultures taken, and had an ultrasound scheduled for several days later. (*Id.* at 770).

On May 16, 2012, Plaintiff received a second mental consultative examination. (*Id.* at 837-40). This consultation was performed by Victor Carbone, Ph.D., on behalf the UMass Disability Services, also in furtherance of an application for government assistance. Carbone noted Plaintiff's reports of experiencing auditory hallucinations as recently as the day prior and recorded that she did not report having them the day of the appointment. (*Id.* at 837). Carbone noted that Plaintiff cried without his posing any "real" questions, and that she generally avoided looking at him and focused her eyes on a coloring book she had brought in from the waiting room throughout the examination. (*Id.* at 839). He further noted that Plaintiff appeared to grow more comfortable when shown empathy during the examination, apparently crying less over the length of the meeting. (*Id.* at 840). At the conclusion of his report, Carbone diagnosed major depressive disorder with psychotic features and a "rule out" diagnosis of posttraumatic stress disorder, and assigned a GAF score of 51. (*Id.* at 840).

The following day, on May 17, 2012, Plaintiff presented to Willard Brown, D.O., also of UMass Disability Services, for a physical consultative examination. (*Id.* at 842-45). Plaintiff complained of weight issues, consequent muscle aches and joint pain, swelling, anemia, headaches, asthma, yeast infections, and bacterial infections in the "buttocks area." (*Id.* at 840-43). She also noted that she has "therapy and takes medications for emotional issues." (*Id.* at 843). Upon examination she was observed as "alert, oriented[,] and well-nourished." (*Id.*) Under "Impression" Brown listed:

1. Overweight.
2. Chronic arthralgias and myalgias.
3. Chronic low back pain – patient positive for incomplete fusion anomaly of posterior arch of SI
4. Anemia.
5. Chronic headaches.
6. Asthma.
7. Chronic bilateral wrist/hand pain numbness and weakness

8. Probable chronic vaginal yeast infection.
9. Probable bacterial infection in lower buttocks area.

(*Id.* at 844-45).

Plaintiff presented at the MMC emergency room again on September 12, 2013, this time with complaints of increased anxiety after her "her medications ha[d] been changed" and received a referral to Behavioral Health Network ("BHN"). (*Id.* at 901, 907, 1044). She reported "thought[s] about not wanting to be alive" and "hysterical" feelings after being "off her medication for the last month." She nevertheless denied suicidal ideation, stating "I have two kids. I couldn't do that." (*Id.*) Plaintiff "lived with a friend" at the time, which was just over a month after "she left her abusive husband." (*Id.* at 899) Plaintiff stated she received no current outpatient mental health treatment after being discharged for "missing an appointment," but had applied for reentry and was on a waiting list at VPS. (*Id.* at 901). She further reported an abscess, head and body aches, and that she felt "sick every day." (*Id.*) Under "Trauma History," her history of sexual and physical abuse by father, stepfather, and numerous boyfriends and husbands were noted. (*Id.* at 902). Under "Additional Information," Laura Boisseau, Crisis Clinician, noted that Plaintiff was "known to BHN Crisis though seven previous assessments dating back to 1998 [and] denied a history of inpatient psychiatric admissions[,] however previous assessment stated that she was hospitalized at Baystate APTU in 1998 after she attempted to drown herself." (*Id.* at 903.) Boisseau further recorded Plaintiff's statements that her current primary care doctor prescribed "her [unlisted] medications" and that she "slashed her wrist" in 2008 "because she was scared of her husband and wanted him to stop coming after her." (*Id.*) Plaintiff denied any other history of "suicidal gestures." (*Id.*) Under "comments," Plaintiff is described as "dressed in hospital clothing" with "unremarkable" hygiene and grooming. (*Id.* at 904). "Affect" was "tearful," but "thought process" described as "clear, intact." (*Id.*). Diagnoses included posttraumatic stress disorder and depressive disorder and severe

"psychosocial and environment problems." (*Id*. at 907-08). Plaintiff received a GAF score of 45 and an outpatient referral. (*Id*. at 908-09).

Records from the Emergency Department of Mercy Medical indicate Plaintiff appeared on August 14, 2014 complaining of "psychological distress" after "being involved with a fire [the prior] week." (*Id*. at 1041). She presented with statements that she had "ran out of her anti-anxiety medication" and experienced "increased panic attack[s] secondary to stress." (*Id*.) Plaintiff denied suicidal ideation "or depression." (*Id*. at 1041). She was found "awake, cooperative, anxious," and "alert and oriented X 3." (*Id*. at 1041-42). She was prescribed Ativan for anxiety, and her disposition at discharged was described as "home, self-care." (*Id*. at 1042-43).

**B.    Testimony before the ALJ**

(1). November 27, 2012 ALJ Hearing

Plaintiff was represented at her first hearing by her current counsel and, besides a vocational expert, provided the only testimony. (A.R. at 48). In response to the ALJ's initial questioning, Plaintiff testified as follows. She weighed 172 pounds, 22 pounds heavier than her typical weight of 150 pounds. (*Id*. at 54). Her only income derived from welfare and food stamps. (*Id*. at 58). She payed rent for a shared apartment "through the welfare" and had never acquired a driver's license. (*Id*. at 54-55). She had two children, whom she "sometimes" saw, and worked for roughly a year as a part-time airline ticket agent in or around 1996, before she incurred back injury and began receiving worker's compensation, which she ceased receiving after "a couple of months." (*Id*. at 55-56).

Regarding physical problems, Plaintiff testified that she had consistently suffered from asthma for ten years and used a nebulizer or pump once a day. (*Id* at 59). She visited an emergency room in 2011 after an asthma attack. (*Id*. at 59-60.) Plaintiff also discussed problems with her back, neck, and shoulder, which she treated by visiting chiropractors and taking Flexeril, medication Plaintiff described as a "muscle spasm pill," and for which she received unspecified "injections." (*Id*.

at 60-61). Plaintiff also received physical therapy and declined pursuit of "back surgery" because she "was too scared to go through with it because [of] the risks." (*Id.* at 61). She rated her pain as an eight out of ten, with medication, and 10 without. (*Id.* at 61-62). She described the pain as primarily in her lower back but spreading to her shoulder and radiating "down to [her] ankles and legs." (*Id.* at 62). She had unrelated right ankle problems stemming from a break in or around 2004, which included "swelling and aching and hurting" after standing for 10 minutes or longer. (*Id.* at 62-63).

Regarding mental issues, Plaintiff testified to experiencing depression "for many years . . . since I was little." (*Id.* at 63). She claimed to have taken an unspecified "medicine" for the problem "on and off for many years." (*Id.*) As of the November 2012 hearing date, Plaintiff attended therapy once a week for "[a] couple of weeks now[,]" after a lapse in treatment that lasted approximately one year. (*Id.* at 63-64). In response to a direct question from the ALJ, Plaintiff testified that she had been hospitalized in 2010 "for a couple of weeks." (*Id.* at 64). When asked why she had been hospitalized, Plaintiff stated, without elaboration, "[s]uicidal." (*Id.*) She was previously hospitalized for "similar situations" in or around 2002 and "1998 or 1999." (*Id.*) Plaintiff testified to taking "medicines" for the issue, and occasionally side effects involve head- and stomachaches. (*Id.* at 65). Regarding anxiety, Plaintiff stated she experienced panic attacks on a daily basis. (*Id.* at 66).[10]

When questioned by her counsel, Plaintiff stated she had received mental health treatment since 2002 but ceased after her therapist left the practice. (*Id.* at 74). She received medications from a primary care physician, which "somewhat" helped her anxiety and to "keep [her] calm." (*Id.* at 75). She spoke of sleeping "four . . . maybe three hours" a night but taking naps during the day. (*Id.*) Occasionally she did not get out of bed due to pain and depression. (*Id.* at 75-76). She further

---

[10] Plaintiff's testimony regarding her panic attacks apparently followed the occurrence of one at the hearing. When describing side effects of treatment, Plaintiff's testimony trailed off mid-sentence and the ALJ asked, presumably after a pause, "Would you like to take a break ma'am? Would that be helpful?" (*Id.* at 65). At that point the ALJ halted questioning and "there ensued an off-the-record discussion." (*Id.*) Shortly after questioning resumed the ALJ broached the topic of panic attacks, asking Plaintiff if she experienced them and, after Plaintiff answered affirmatively, "how often does this problem come on?" (*Id.* at 65-66).

described "full-blown panic attack[s]" occurring "[a]lmost every day" and triggered by visits to crowded places, including hospitals, whenever she ventured out. (*Id.* at 76-77). She described taking deep breaths and wetting her face as a means of a way of calming herself, and further described forgetfulness, distraction, and "racing thoughts." (*Id.* at 77).

A vocational expert then testified, responding as usual to hypothetical questions posed by the ALJ. (*Id.* at 80). The expert first opined that jobs existed in the national economy for a person with Plaintiff's education and work experience and certain exertional and functional limitations. (*Id.* at 80-81). The ALJ then asked the expert to assume additional limitations preventing a hypothetical individual from making public contact—including contact with coworkers and the general public— "one-third of the time." (*Id.* at 81). The expert opined that the position of "holding machine tender" could be performed within those limitations and existed in "700 jobs in Mass[achusetts] and 35,000 nationally." (*Id.* at 82). Finally, the ALJ asked the expert to assume "additional limitations that, due to chronic pain, psychiatric symptoms, [caused an] individual [to be] off task from work duties at least 25 percent of the workday" and opine whether any suitable jobs existed in the national economy. (*Id.*) The expert opined that such individual could not perform the jobs previously discussed, "nor any others on a full-time basis." (*Id.*)

(2). November 17, 2014 hearing

The same ALJ presided over Plaintiff's second hearing following remand by the Appeals Council. Again, Plaintiff and a vocational expert provided the only testimony. (*Id.* at 14-47). At the outset, Plaintiff's attorney advised the ALJ that she had appealed the prior decision to seek a favorable ruling concerning disability prior to Plaintiff's date last insured and, therefore, qualify her to receive SSDI in addition to SSI. (*Id.* at 18).

Upon questioning by the ALJ, Plaintiff testified as follows. She subsisted on food stamps, "Mass Health," and the SSI benefits previously granted after the prior hearing. (16, 24). When asked

what her most "significant problem" was, Plaintiff said it was her "emotional state." (*Id.* at 24). She had received treatment since she was roughly five years old, but currently was not on medication due to pregnancy. (*Id.* at 24). She had not been to therapy for over a year, which stopped after Plaintiff missed two appointments. (*Id.* at 25). The facility that had provided such treatment was "really strict on absence" and effectively expelled her from the program for attendance issues. (*Id.* at 25). She was currently on the waiting list at two other "places," presumably for similar therapy. (*Id.* at 25). Plaintiff further testified to visiting the emergency room "probably, like, five times" in the months prior to the 2014 hearing. (*Id.* at 25). She explained the general reason for the visits as "anxiety after the fire" that apparently caused her to move from her prior residence. (*Id.* at 25). Upon questioning by her counsel, Plaintiff described symptoms of her depression as "thinking and remembering and just every day living and [not] wanting to be alive." (*Id.* at 37). She also described inability to sleep and sporadic triggers to her anxiety: "[i]t can be anything. Even just how the day looks." (*Id.* at 38).

As with the prior hearing, the ALJ concluded by posing hypotheticals based on someone with Plaintiffs' background and certain assumed limitations. (*Id.* at 43-45). Each hypothetical concerning physical limitations led to answers that work was available in the national economy. Finally, the ALJ again asked if work would be available to an individual who "would be off task 25 percent of the workday." (*Id.* at 45). The expert responded as had the first, stating that being off task for that "percentage of the workday would . . . eliminate all work." (*Id.* at 45).

### III.    STANDARD OF REVIEW

The role of a district court reviewing an administrative law judge's decision is limited to determining whether the conclusion was supported by substantial evidence and based on the correct legal standard. *See* 42 U.S.C. §§ 405(g) and 1983(c)(3); *Manso-Pizarro v. Sec'y of Health & Human Servs.,* 76 F.3d 15, 16 (1st Cir. 1996). Substantial evidence is more than a scintilla, less than a preponderance, and is such that a reasonable mind might accept it as adequate to support a

conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Even if the administrative record could support multiple conclusions, a court must uphold the Commissioner's findings "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.'" *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F. 2d 218, 222 (1st Cir. 1981)).

## IV.  DISABILITY STANDARD AND THE ALJ'S DECISIONS

Entitlement to SSI requires a showing of both disability and financial need on or after the date of the SSI application. *See* 42 U.S.C. § 1381a. Entitlement to SSDI benefits requires a showing that, among other things, a claimant had disability while insured under the Act. 42 U.S.C. § 423(a)(1)(A)-(E). Plaintiff's financial need is not challenged, nor is Plaintiff's the date when Plaintiff was insured for SSDI. Therefore, whether Plaintiff has a "disability" within the meaning of the Act and the onset date of disability are primary issues at hand.

The Act defines disability, in part, as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual is considered disabled under the Act:

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). *See generally Bowen v. Yuckert,* 482 U.S. 137, 146-49 (1987).

In determining disability, the Commissioner must apply a five-step protocol described by the First Circuit as follows:

> 1) If the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

*Seavey v. Barnhart,* 276 F.3d 1, 5 (1st Cir. 2001); *see also* 20 C.F.R. § 416.920(a)(4).[11]

### a. ALJ'S FIRST DECISION – JANUARY 18, 2013

The ALJ issued his first decision on Plaintiff's SSI and SSDI applications on January 18, 2013. (A.R. at 93-106). The decision was partially favorable, awarding SSI benefits and denying SSDI benefits, with the difference contingent on a finding of when Plaintiff became disabled. More specifically, the ALJ found Plaintiff disabled as of April 13, 2010, the date of Plaintiff's initial application, and not before. As for time periods preceding the application date, the ALJ found at step two that Plaintiff was not disabled. Before so finding, the ALJ determined that Plaintiff had "the following medically determinable impairments: major depressive order, post partum [sic] onset, generalized anxiety, posttraumatic stress disorder, history of right ankle fracture, back pain, shoulder pain, asthma, and anemia."[12] (*Id.* at 96 (citations omitted).) The ALJ then deemed those impairments "non-severe" prior to application date after determining Plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms during that time-period not credible in light of a "lack of evidence on record prior that established onset date" of April 13, 2010. (*Id.*) Noting there was "no evidence on record dating to or before, March 31, 1999," the ALJ found:

> The record on evidence [sic] indicates there were extensive periods of time where the claimant did not treat with any form of medical provider. When she did receive treatment from [VPS], the claimant

---

[11] The Code of Federal Regulations and the Act contain separate, mirroring sections for DIB and SSI. Because the disability evaluation process is substantively identical as to each, the court will cite to single sections for simplicity's sake, unless otherwise indicated.
[12] The ALJ's decision did not clarify when these impairments began.

would only treat for a period of three to four sessions before stopping treatment. Her two periods of treatment with [VPS] occurred in 2003/2004 and not again until 2007. Moreover, her records from 2007 revealed she had only mild symptoms, suggesting a non-severe impairment. Therefore the claimant does not have a consistent disability or one that has lasted twelve <u>consecutive</u> months.

(*Id.* at 97-99).[13] On that basis, the ALJ concluded Plaintiff was not disabled prior to the application date. (*Id.*)

As for impairments on and *after* the application date, the ALJ found Plaintiff suffered from chronic arthralgia and myalgia, obesity, in addition to the same eight impairments listed above. (*Id.* at 100). Noting increased visits and treatments for physical impairments, emphasizing treatment notes and GAF scores received from VPS and the consulting examiners, and otherwise crediting the evaluative mental consultations, the ALJ found those impairments "severe" in the aggregate as of April 13, 2010. (*Id.* at 103-104). After finding Plaintiff had no past relevant work, the ALJ determined that Plaintiff had an RFC that allowed performance of basic and unskilled "light" work with a limitation that Plaintiff could not, among other things, remain "on task" more than 75% of a workday. (*Id.* at 100-04). Based upon the vocational expert's testimony that there were no jobs in the national economy that allowed one to be so frequently "off task," the ALJ ultimately found Plaintiff disabled at step five. (*Id.* at 105). Thus, in the manner describe above, the ALJ denied Plaintiff's SSDI application and granted her SSI application with an onset date of April 13, 2010.

  a. <span style="font-variant: small-caps;">Appeals Council Reversal – March 28, 2014</span>

Roughly 14 months later the SSA Appeals Council reversed the ALJ's decision to grant Plaintiff's SSI application and effectively remanded with instructions to deny both the SSI and SSDI

---

[13] The ALJ plainly misread the record in finding that Plaintiff treated only "three to four" times with VPS in each time period. Plaintiff received therapy or treatment at VPS no fewer than 21 times between May 2003 and June 2004. The ALJ apparently believed the VPS Therapy Review Form memorialized single visits to that establishment. A close reading, however, makes clear that this form provided treatment summaries, objectives, and progress on a quarterly basis. The August 28, 2003 form, for instance, indicates a *weekly* "[t]reatment [f]requency" and reviews 12 distinct "sessions" during the quarter running from May to August of 2003 . (*Id.* at 876).

claims. (*Id.* at 114-16). The Council took issue with the ALJ's RFC assessment, stating that the "off task 25 percent of the workday" limitation was "not supported by substantial evidence." (*Id.* at 114). According to the Council's brief two-page order, that limitation was undermined by (i) the absence of any notation indicating "mood disorders or recent psychological stressors" in records from Plaintiff's annual gynecological visit, (ii) the presence of an "N," indicating "no," to *pro forma* questions concerning depression and feelings of self-harm in a computer-generated intake form from Plaintiff's March 23, 2012 emergency room visit for abdominal pain and vaginal discharge, (iii) Plaintiff's purported "den[ial] of recent hallucinations" during Dr. Carbone's April 2012 mental consultative examination, and (iv) the absence of reference to "mental health issues" in the Report from Plaintiff's physical consultative examiner. (*Id.* at 114-15). In light of those documents, the Council remanded for "further consideration of the claimant's functional limitations" and further determination of disability at step five of the analysis. (*Id.* at 115).

### b.   ALJ'S SECOND DECISION – APRIL 14, 2015

Just over a year later, the ALJ issued his second decision, denying both the SSI and SSDI applications. The first decision transparently served as a template for the second, with much of the factual recital and portions of the analysis repeated verbatim. Where the second differed from the first, the changes forced the conclusion that Plaintiff was not disabled at any point—either before or after her application date—and therefore did not merit benefits of any kind. To reach that result, the ALJ made four material changes to his first written decision. He (i) removed the temporal distinction between pre- and post-application analyses at step two, (ii) replaced his step-two conclusion that Plaintiff was not disabled *prior* to the application date because she did not have "severe" impairments with a finding that she *did* have severe impairments,[14] (iii) removed "since April 12, 2010" and the

---

[14] More specifically, the ALJ removed the "pre-application date" step-two finding and left standing the "post-application date" step-two finding after striking "Beginning on April 13, 2010, the application date . . ." (*Compare* A.R. 100 *with* A.R. 123). Otherwise the "severe" impairments were identical to those listed in the original decision.

"25% off task" limitation from his RFC finding, and (iv) expanded the scope of his finding that plaintiff's statements concerning the intensity and limiting effects of her symptoms were "not entirely credible" to encompass periods falling both before and after the application date. In this manner, the ALJ essentially grafted the Appeals Council's reasoning onto his prior written decision to reach an RFC assessment without the "25% off-task" limitation.[15]

## V.    ANALYSIS

Upon careful review of the record, the court concludes the ALJ's second opinion adopted errors made in Appeals Council's decisions and made findings that do not rest on substantial evidence. Because the ALJ's original opinion found ample support in the record, contrary to the Appeal's Council's flawed review, the court now reverses the ALJ's second opinion and holds that Plaintiff was disabled as of April 13, 2010. The case is remanded pursuant to sentence four of 42 U.S.C. § 405(g) for the limited purpose of awarding SSI benefits to Plaintiff in the appropriate amount based upon her original application.

The Appeals Council reasoned that the ALJ's RFC assessment was undermined by four items of evidence. Following the Council's direction, the ALJ then emphasized that evidence in his second decision, using it as a basis for altering credibility findings and the weight assigned to consulting and treating sources. As explained below, this evidence in no way undermined the ALJ's original analysis and the second ALJ decision is not supported by substantial evidence.

The Council's first reason concerned records from a May 20, 2011 annual checkup at Plaintiff's gynecologist, Dr. Singer. (*Id.* at 721-23). During this visit she received gynecological counseling and a pap smear. Singer wrote Plaintiff was "in a good state of health since her last

---

[15] As for new evidence postdating the original decision, the ALJ only considered evidence documenting a lack of changes or a worsening of physical conditions, primarily involving back pain and chiropractic visits. (*See id.* at 128-129). To the extent the ALJ considered new evidence relating to mental impairments, such evidence played no apparent role in the ALJ's analysis and did not suggest a subsiding of symptoms or limiting effects.

exam" and made no notation indicating "mood disorders or recent psychological stressors" was included in the "PSYCH" field in Singer's standardized form. (*Id.* at 114). The Appeals Council suggested Plaintiff's "good state of health" referenced her mental health and, alongside the absence of marks for mood disorders or stressors, undermined the psychiatric examination performed two weeks later by Dr. Bishop. Dr. Singer's records present no such counterweight and have no relevance to Plaintiff's mental health whatsoever. Read in context, reference to "a good state of health" is an obvious reference to *gynecological* health. Likewise, that no psychological stressors or mood disorders are noted in a prefabricated "PYSCH" line in Singer's *pro forma* template is entirely unremarkable. No reasonable inference concerning mental health can be drawn from this single, standardized line in a three-page document populated as a record for a *physical* checkup. Even while assuming that Dr. Singer's office intentionally populated the "PYSCH" field and that Plaintiff in fact stated that she had no mood disorders or stressors, no reasonable person could conclude after reviewing the record as a whole that she accurately provided that information to her gynecologist, let alone that she had an unhindered capacity to do so. *See Groberg v. Astrue*, 505 F. App'x 763, 769 (10th Cir. 2012) ("A single 'good day' at the doctor's office does not necessarily signify the lack of any occupational effects from mental disorders."); *cf. Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (noting the impropriety of "cherry-picking" from a mental health treatment note to support rejection of an overall longitudinal assessment of a claimant's mental functional limitations). In short, Dr. Singer's gynecological notes provide no basis for assessing Plaintiff's mental health, her credibility regarding her symptoms, or for reducing the weight previously given to Dr. Bishop's consultative report, which found Plaintiff plagued by traumatic memories, anxiety, and depression

and concluded that her "sensitive fear would lead to withdrawal from work and lead to withdrawal and nonattendance." (*Id.* at 668).[16]

The Council's second reason for altering the RFC assessment also finds no support from substantial evidence. The Council suggested that the presence of an "N," indicating "no," to questions concerning depression and feelings of self-harm in an emergency room intake form somehow undermined Bishop's consultative report and the ALJ's initial analysis. (A.R. at 114). Plaintiff appeared at the M.M.C. E.R. on the date in question complaining of abdominal pain and vaginal bleeding. (*Id.* at 768). The second page of the intake "ED Summary Report" generated from this visit lists three questions, each phrased in the second person, asking:

> Are you currently feeling symptoms of Depression?
> Have you ever had feelings of self harm in the past?
> Are you currently having feelings of self harm?

(*Id.* at 769). Each answer is followed by an "N." The form is computer-generated, and bears no handwriting from either plaintiff or those treating her. Without more context and support from the record it is reckless to assume this form—generated from a visit for *physical* complaints—was intentionally and accurately completed. It is outright error to make that assumption in light of the present record, where numerous treating physicians, social workers, therapists, and consultative examiners credited Plaintiff's statements concerning trauma, depression, suicidal ideation, and other mental stressors.

---

[16] While the court assumes for the purposes of this decision that Dr. Singer's office intentionally populated the PSYCH field in an effort to accurately address the matter, it is extremely doubtful that it did so. It is far more likely that the contents were carried over from a prior record that served as a template or so-entered as a matter habit. As this court, the ALJ, and the Appeals Council should all know, prefabricated queries concerning tangential matters in medical forms are frequently filled out in haste and often incorrect. Examples abound in the record here, as they do in most social security cases. For example, no mark is made in a June 8, 2007 MMC "Obstetric Outpatient Record" for "Emotional State," where the options include "Anxiety," "Depression," and "None," although this record was generated just two days after Plaintiff experienced "fetal demise" when 25-weeks pregnant. (A.R. at 466). Records from the same office generated on the day of the demise make the same omission. (*Id.* at 467). An identical from generated the previous day, when Plaintiff first presented at the MMC, had "anxiety" affirmatively marked. (*Id.* at 468). Regardless of whether these fields were intentionally and accurately completed, these records do not undermine Plaintiff's testimony or the opinions of treating and consulting physicians any more than those of Dr. Singers. To suggest otherwise is a grievous error.

The Council's third reason strains comprehension outright and, at a minimum, misreads the record. The council cited the fact that Plaintiff "denied recent hallucinations" when meeting with her second mental consultative examiner, Dr. Carbone, on May 16, 2012. (*Id.* at 115). A review of Carbone's report, however, makes clear that Plaintiff made no such denial. Rather than denying "recent hallucinations," Plaintiff reported experiencing auditory hallucinations "for many years," including the day prior, "but did not report any auditory or visual hallucinations on the day of the appointment." (*Id.* at 837). That Plaintiff did not report hallucinations the day of her report does not undermine her credibility or the conclusions drawn by numerous physicians. A patient need not experience hallucinations on a daily basis in order to be mentally ill, and that Plaintiff "did not report" any hallucinations does not, moreover, establish she did not *experience* them. It is therefore not surprising that neither Dr. Carbone nor the ALJ's first opinion did not discredit Plaintiff's account on this trifling basis. To the contrary, he assigned her a GAF score of 51, diagnosed her with major depressive order with psychotic features, and otherwise generally opined as to her limitations. (*Id.* at 839). Again, this "evidence" is not substantial and in no way undermines Plaintiff's credibility concerning the extent and effect of her symptoms or the weight initially assigned to examining and treating sources in the ALJ's original decision.

The Council's fourth reason is also extremely misguided. It cited the fact that Plaintiff's *physical* consultative examiner, Dr. Brown, made no notation of "mental issues" as evidence undermining Plaintiff's testimony regarding her symptoms and, presumably, her malingering. (*Id.* at 115). The absence of discussion of "mental issues" in Brown's report is irrelevant. The scope of the report is physical, and Dr. Carbone's consultative examination, which occurred the day prior, was scheduled by the same agency as that scheduling Dr. Brown's. There is no reasonable basis to expect Dr. Brown to address mental issues in his report, and their absence is entirely unremarkable. To the

contrary, Dr. Brown's passing reference to Plaintiff's ongoing use of therapy and medications for "emotional issues" is all—indeed, more—than can be expected from his report on the topic.

Because the ALJ's second opinion essentially forced new conclusions based on the above four items, it suffers the same shortcomings. The second opinion altered credibility findings and the weight assigned to certain sources, and the alterations rested entirely on the four records discounted above. That foundation has collapsed and those findings therefore find no support from substantial evidence. For example, the assignment of "little weight" to GAF scores provided by Carbone and Bishop were made because they were "deemed somewhat inconsistent with the mental status examination."[17] (*Id.* at 130-31). Likewise, the ALJ assigned "no weight" to the GAF score of 45 provided by the MMC ER physician on April 21, 2013, because it was deemed "inconsistent" with an unspecified "mental status examination." (*Id.* at 131). These inconsistencies are neither apparent to the court nor explained by the ALJ. Similarly, little weight is assigned to VPS records "due to minimal amount of treatment from" that source. (A.R. at 129). In finding that Plaintiff received "minimal treatment" the ALJ errs, however, and apparently misread VPS treatment summaries as noted above. To the contrary, Plaintiff visited VPS over 20 times between May 2003 and June 2004 alone. *See* note 16, *supra*. In short, none of the Council's proposed reasons nor any of the consequent changes made by the ALJ rest on substantial evidence.

One might argue (although the Commissioner has not) that Dr. Langer's MRFC form suffices as substantial evidence for the ALJ's second RFC finding. It does not. Dr. Langer is a "reviewing physician" who did not examine Plaintiff directly. He reviewed the record as of June 2011 and on that basis alone "opined" by checking boxes in a prefabricated MRFC form that Plaintiff had only minor limitations affecting her ability to work. (*Id.* at 685-88). The First Circuit has

---

[17] The ALJ did not expressly address the weight given to Carbone's GAF score, but the context and result of the RFC assessment make clear little to no weight was assigned.

made clear that such forms are entitled to "relatively little weight" when they contain "brief conclusory statements or the mere checking of boxes denoting levels of residual functional capacity," as is the case here. *Berrios Lopez v. Sec'y of Health & Human Servs.*, 951 F.2d 427, 431 (1st Cir. 1991). Dr. Langer's explanation contained only brief conclusory statements: he literally provided only his conclusions regarding Plaintiff's ability to remember, understand, and focus on tasks and operate in "work-like settings." (A.R. at 673). His basis for these conclusions are not included. The reasons for those conclusions ostensibly appear in his PRT form, at the end of which he summarizes the consultative report by Dr. Bishop and certain records from VPS, but neither provide a sound or legible basis. Citing the former, he recounted that Plaintiff "sees children and housekeeper regularly" and had "always done well at work." (*Id.* at 687). Dr. Bishop's own assessment, of course, ran contrary to Langer's assessment and cannot serve as a basis for undermining itself. In citing the latter, Langer asserted that Plaintiff "has had positive work relationships." (*Id.*) That Plaintiff at some unspecified point in the past had "positive work relationships" is, however, irrelevant to her ability to remain on task and otherwise perform at work.

In short, neither the ALJ, the Commissioner, nor the court's own thorough review of the record has disclosed substantial evidence supporting the ALJ's second opinion. In arguing to the contrary, the Commissioner's brief essentially repeats the reasoning initially outlined by the Appeals Council and later incorporated by the ALJ. For the reasons above, that reasoning is not persuasive borders on appearing ethically misguided. The Commissioner also argues that the first RFC assessment lacked support from the record because no treating or examining physician specifically opined that Plaintiff would be off-task 25 percent of each work day as a secondary effect of mental pain and psychiatric symptoms. (Dkt. No. 21 at 8). This is little more than an assertion that substantial evidence does not support that finding. To the contrary, Dr. Bishop's 2011 opinion that Plaintiff's "sensitive fear would lead to withdrawal from work and nonattendance," (*id.* at 668), the

2004 VPS discharge summary describing her condition at discharge as involving "poor concentration," (*id.* at 872), the 2010 VPS GAF score of 48, and Plaintiff's 2012 and 2014 testimony regarding frequent panic attacks and inability to focus, (*id.* at 76-77, 36-38), provide a substantial basis for finding Plaintiff had such limitations on her focus.

## VI.    REMEDY

Having determined that the ALJ's second opinion rested on error, the issue of remedy remains. Plaintiff moves in general terms for "judgment on the pleadings" without specifying whether she seeks remand for further determination of disability or a ruling that conclusively decides the matter.[18] (Dkt. No 12). The court construes the motion as seeking alternative relief of either (i) a finding that Plaintiff is disabled with a limited remand for the purpose of determining the amount of benefits owed, and (ii) a remand for a fresh determination of whether Plaintiff is disabled for the purposes of both her applications.

"The question of remedy is tied to the strictures of § 405(g): 'the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.'" *Seavey v. Barnhart*, 276 F.3d 1, 10 (1st Cir. 2001) (quoting 42 U.S.C. § 405(g)). "Hence, the responsibility for weighing conflicting evidence, where reasonable minds could differ as to the outcome, falls on the Commissioner and his designee, the ALJ." *Id.* (citing *Walker v. Bowen,* 834 F.2d 635, 639–40 (7th Cir.1987)). Nevertheless, "[i]f the evidence and law compelled one conclusion or the other, then [district courts may] order an award of benefits or affirm a denial of benefits. For example, a judicial award of benefits would be proper where the proof of disability is overwhelming or where the proof is very strong and there is no contrary evidence." *Id.* at 11 (citing *Mowery v. Heckler,* 771 F.2d 966, 973 (6th Cir.1985)). "Similarly, if correcting the legal error clarified the record

---

[18] The final sentence in the substantive portion of her brief provides little more specificity, stating that the "case should be remanded back for another [h]earing for clarification on" the issue of her "disability status." (Dkt. No. 13 at 13).

sufficiently that an award or denial of benefits was the clear outcome, then the court may order payment or affirm denial." *Id.* Moreover, in some cases equitable concerns for excessive delay may weigh against remanding for further administrative findings. *See id.* at 12-13 ("[A]dministrative deference does not entitle the Commissioner to endless opportunities to get it right."); *see also Perez v. Colvin*, 214 F. Supp. 3d 1200, 1214 (N.D. Ala. 2016) (remanding with instruction to award benefits after six-year delay); *Larlee v. Astrue*, 694 F. Supp. 2d 80, 887 (D. Mass. 2010) ("To remand for a third hearing would only further prolong "what has proven a painfully slow process. Administrative deference does not entitle the Commissioner to endless opportunities to get it right"); *Rohrberg v. Apfel,* 26 F.Supp.2d 303, 312 (D.Mass.2011) (awarding benefits where plaintiff "applied for disability benefits almost five years ago. Further delay would only lengthen what has proven a 'painfully slow process.'")

In this unique posture, where an Appeals Council order resulted in a flawed second assessment, where Plaintiff's application was filed more than eight years ago, where the ALJ's first analysis made detailed findings at each step of the analysis and concluded that Plaintiff was disabled as of a date certain, and where neither Plaintiff nor the Commissioner contends that the ALJ's first opinion involved legal error, the court finds that a limited remand is in order.[19]

In closing, the court observes that Plaintiff has been ill-served by virtually every facet of the social security system from which she sought help over an eight-year period. After the ALJ's initial decision granting SSI, Plaintiff's counsel administratively appealed the denial of SSDI benefits on the slimmest factual basis and in the absence of any mental health records from before or sufficiently near Plaintiff's date last insured. The Appeals Council then—either misreading or misconstruing the

---

[19] Plaintiff does not dispute that her date last insured for purposes of SSDI was March 31, 1999, as the ALJ found. Nor does Plaintiff argue before this court that the ALJ erred in initially determining there was insufficient evidence to establish that she was disabled as of that earlier date. The court nevertheless thoroughly reviewed the record and finds that the ALJ made no error in this respect. Nearly the entirety of the record was generated years after March 31, 1999.

record—essentially remanded with instructions to deny SSDI benefits and vacate the SSI award. Plaintiff's counsel did not address the errors in the Council's reasoning or meaningfully marshal the record in her client's favor. Considering these failures occurred within a system meant to provide basic, subsistence benefits to those who need it most, they come at a dramatic cost.

## VI. CONCLUSION

For the reasons above, the court GRANTS Plaintiff's motion, (Dkt. No. 12), DENIES the Commissioner's motion, (Dkt. No. 16), and REMANDS with instructions to find Plaintiff disabled as of April 13, 2010 and promptly determine the amount of benefits owed, past due or otherwise.

It is So Ordered.

/s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge